RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
JOANNE L. DIAMOND
Assistant Federal Public Defender
Nevada State Bar No. 12223
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577
Joanne_Diamond@fd.org

Attorney for Justin Edward Brown

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>JUSTIN EDWARD BROWN,<br><br>　　　　　Defendant. | Case No. 2:22-cr-00214-JAD-DJA<br><br>**Motion to Dismiss**[1] |

On October 12, 2022, the government indicted Mr. Brown with one count possession of a firearm by a prohibited person and one count possession of ammunition by a prohibited person under 18 U.S.C §§ 922(g)(1) and 924(a)(2). ECF No. 1. The indictment alleges Mr. Brown possessed a privately manufactured, 9mm semiautomatic pistol plus one or more rounds of ammunition. *Id.* Both counts fail constitutional muster under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The indictment against Mr. Brown should therefore be dismissed.

---

[1] This motion is filed timely. ECF No. 21.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**Points and Authorities**

**I.     Argument**

Mr. Brown moves to dismiss the indictment as unconstitutional under *Bruen.* That case fundamentally—and explicitly—abrogated prior circuit precedent on gun regulation. Under the new test, Mr. Brown is part of "the people" entitled to own firearms and attendant ammunition irrespective of any prior felony conviction. And the government cannot show any historical tradition divesting him of those rights. This Court should therefore dismiss the indictment.

> **A.     *Bruen*'s new approach to the Second Amendment abrogated the Ninth Circuit's framework and must be applied here.**

*Bruen* upended Second Amendment jurisprudence. It explicitly rejected the test previously applied in every federal court of appeals, including the Ninth Circuit. This Court is therefore no longer bound by prior Ninth Circuit opinions on the subject. *Bruen* alone applies.

A district court is generally bound to follow prior decisions of the court of appeals for its corresponding geographic circuit. But that general rule gives way when the United States Supreme Court issues a decision that conflicts with then-applicable circuit law. If that "intervening Supreme Court authority" is "clearly irreconcilable" with prior circuit authority, "district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

To determine whether a prior opinion is irreconcilable, courts look to both "the holdings of higher courts' decisions" and those decisions' "mode of analysis." *Id.* (quoting Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L.

Rev. 1175, 1177 (1989)). If the Supreme Court decision "undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable," then the Supreme Court decision controls. *Id.* The intervening Supreme Court opinion need not directly overrule prior circuit cases. *Id.* And the issue the Supreme Court resolves "need not be identical in order to be controlling." *Id.* So long as the approaches are "at odds," the newer Supreme Court opinion governs. *Id.*

      *Bruen* rewrote the rules for determining whether a firearm law satisfies the Second Amendment. Previously, courts of appeals (including the Ninth Circuit) had evaluated such laws under a two-step test: history-and-tradition *plus* means-end scrutiny. *United States v. Chovan*, 735 F.3d 1127, 1134–42 (9th Cir. 2013). In the pre-*Bruen* regime, courts first considered whether the law was consistent with analogous gun restrictions from the Nation's founding and early history. *Id.* at 1136–38. If it was, the law passed constitutional muster. *Id.* But if it was not, the law could still survive at the second step through a balancing test; if the government's interest in the restriction outweighed the infringement on the individual, step-two authorized it. *Id.*

      *Bruen* changed the applicable analysis in at least two ways. First, *Bruen* got rid of the second means-end step entirely. *Bruen*, 142 S. Ct. at 2127 ("[I]t is one step too many."). And, second, it tinkered with the first history-and-tradition step. While some courts of appeals had imposed a defense-side burden to show a restriction's inconsistency with history, *Bruen* requires that the government "affirmatively prove that its firearms regulation is part of the historical tradition." *Id.* In the process, *Bruen* recommended considerations in the requisite

3

historical analysis that were either unidentified in prior appellate decisions or irrelevant under those decisions' modes of analysis. *See id.* at 2131.

The analysis under *Bruen*, therefore, is a straightforward (if intensive) one-step history-and-tradition analysis: if the government cannot "identify an American tradition" justifying a firearms or ammunition restriction, the law fails. *Id.* at 2138. No "means-end scrutiny" applies. *Id.* at 2125, 2138. Instead, absent a historical analogue, the inquiry ends, and the law is unconstitutional.

This new test effectively abrogates all prior Ninth Circuit decisions— indeed, all federal court of appeals decisions everywhere—about firearms and ammunition restrictions. Like "every Court of Appeals to have addressed the question," the Ninth Circuit had previously applied the pre-*Bruen* "two-step framework" in "evaluating whether a firearm regulation is consistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2174 (Breyer, J., dissenting); *id.* at 2125 (majority opinion identifying that the courts of appeals had "coalesced" around that mode of analysis); *see Chovan*, 735 F.3d at 1134–37 (applying that two-step test). And the Ninth Circuit had also applied a presumption of lawfulness to certain statutes, concluding that some (like § 922(g)(1)) were protected from scrutiny even absent a full historical analysis. *See, e.g., United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (relying on *Heller*'s "presumptively lawful" language to reject a Second Amendment challenge to § 922(g)(1)).

Those moves are "clearly irreconcilable" with *Bruen*. *Gammie*, 335 F.3d at 900. There is no longer a two-step analysis. There is just one step. *Bruen*, 142 S. Ct. at 2127. And there are no presumptions in favor of certain statutes. The government must now "affirmatively prove" that each challenged statute

4

1
2
3

complies with historical tradition. *Id.* Since Ninth Circuit law on the subject is "directly at odds" with those precepts, it is no longer binding on this Court. *Gammie*, 335 F.3d at 900.

4
5

*Bruen* abrogated *Chovan* and *Vongxay*. This Court should therefore apply *Bruen*'s test—not any pre-*Bruen* Ninth Circuit test—to Mr. Brown's motion.

6
7

**B.    Section 922(g)(1)'s bar on firearm and attendant ammunition possession is unconstitutional under *Bruen*.**

8
9
10
11
12

Section 922(g)(1) fails scrutiny under *Bruen*. Individuals with felony convictions are not excluded from "the people" with the right to own firearms and attendant ammunition. There is no historical tradition sufficient under *Bruen* to justify dispossessing individuals with felony convictions of that right. This Court should therefore dismiss the indictment.

13
14

**1.    The *Bruen* framework applies to possession of firearms and attendant ammunition irrespective of prior felony convictions.**

15
16
17
18
19

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. Individuals have that right regardless of prior felony convictions. And the right includes the right to possess ammunition. The *Bruen* analysis therefore governs both counts of the indictment against Mr. Brown.

20
21

**a.    Individuals with prior felony convictions remain part of "the people" for constitutional purposes.**

22
23
24
25
26

The Second Amendment right extends equally to individuals with prior felony convictions as to those without. As the Supreme Court identified in *Heller*, "the people" protected by the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S.

at 580; *see Range v. Att'y Gen. United States of Am.*, ___ F.4th ___, 2023 WL 3833404, at \*1, \*3–5 (3d Cir. June 6, 2023) (en banc). And so, because "felons" are not "categorically excluded from our national community," they fall within the amendment's scope. *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting), *majority opinion abrogated by Bruen*, 142 S. Ct. 2111; *accord Folajtar v. Att'y Gen. of the U.S.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting). Individuals' prior misdeeds, in other words, do not permanently divest them of constitutional rights.

Comparison to other rights confirms as much. As *Heller* explained, "the people" is a "term of art employed in select parts of the Constitution," including "the Fourth Amendment, . . . the First and Second Amendments, and . . . the Ninth and Tenth Amendments." 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Mr. Brown is, for instance, among "the people" whose "persons, houses, papers, and effects" enjoy Fourth Amendment protection. U.S. Const. amend. IV; *see, e.g.*, *United States v. Lara*, 815 F.3d 605, 609 (9th Cir. 2016). Mr. Brown likewise enjoys "the right of the people" to "petition the government for redress of grievances." U.S. Const. amend. I; *see, e.g.*, *Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017). If Mr. Brown is one of "the people" protected by the First and Fourth Amendments, *Heller* and *Bruen* confirm that he is one of "the people" protected by the Second Amendment, too.

Concluding that ex-felons are part of "the people" aligns with the post-*Bruen* conclusions reached by some other courts, as well. The Third Circuit, sitting en banc, concluded that individuals with prior convictions "remain[] among 'the people' protected by the Second Amendment." *Range*, 2023 WL

3833404, at *1, *3–5. And the Northern District of Iowa similarly held that individuals with prior domestic violence misdemeanor convictions can likewise assert the right. *United States v. Bernard*, No. 22-CR-03, 2022 WL 17416681, at *7 (N.D. Iowa Dec. 5, 2022). Courts have come to similar conclusions for individuals accused, but not yet convicted, of crimes. The Fifth Circuit, for instance, has held that individuals accused of domestic violence can assert their Second Amendment right to possess firearms. *United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023) (emphasizing that an individual need not be "a model citizen" to be "entitled to the Second Amendment's guarantees"). The Western District of Texas has held that individuals under felony indictment can too. *United States v. Quiroz*, No. 22-CR-104, 2022 WL 4352482, at *8-10 (W.D. Tex. Sept. 19, 2022); *see also Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673, at *6–9 (D. Minn. Mar. 31, 2023) (concluding that 18-to-20-year-olds are part of "the people" even though they generally could not vote for much of the nation's history).

The conclusion that individuals with felony convictions or pending charges maintain their right to bear firearms and ammunition makes practical sense, too. These individuals "need arms for lawful self-defense just as much as the rest of us do." Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. Rev. 1443, 1499 (2009). That someone has been convicted of a crime in the past does not diminish that need; arguably, it could increase it.

Individuals with prior felony convictions (like Mr. Brown) are, in short, included in "the people" identified in the Second Amendment. A restriction like § 922(g)(1) is unconstitutional as applied to them.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

### b. Ammunition restrictions amount to firearm restrictions for Second Amendment purposes.

Second Amendment scrutiny applies with equal force to ammunition possession. The Second Amendment protects the right to possess ammunition on the same footing as it does the right to possess firearms. *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014). That is because, as the Ninth Circuit has identified: "A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." *Id.* "[W]ithout bullets, the right to bear arms would be meaningless." *Id.* And so if it would be unconstitutional to restrict access to a firearm, it is also unconstitutional to restrict access to the ammunition needed to use it. Because ammunition is part of the Second Amendment right, then, the ordinary Second Amendment analysis—now governed by *Bruen*—applies.

### 2. Categorically criminalizing ex-felon firearm and ammunition possession fails under *Bruen*.

Under the second step of *Bruen*'s Second Amendment analysis, § 922(g)(1) fails. The government must show a comparable historical tradition of prohibiting felons from possessing firearms and attendant ammunition. But there is none. The statute is therefore unconstitutional.

### a. *Bruen* requires the government to prove a comparable historical tradition of regulation.

Because Mr. Brown is part of "the people" under the Second Amendment, the government under *Bruen* bears the burden of demonstrating "whether 'historical precedent' from before, during, and even after the Founding evinces a comparable tradition of regulation." 142 S. Ct. at 2129. In conducting that analysis, "not all history is created equal." *Id.* at 2131–32. Because

8

"[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," the during-Founding evidence is the most important. *Id*. at 2136 (quotations omitted) (emphasis in original). By contrast, earlier historical evidence "may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id*. Similarly, post-ratification laws that "are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id*. at 2137 (quotations and emphasis omitted). The government bears the burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 2127.

*Bruen* provides guideposts for how to evaluate whether an appropriate condition exists, delineating two types of possible firearm regulations a court might confront. The first type "addresses a general societal problem that has persisted since the 18th century." *Id*. at 2131. With this first type, the historical inquiry "will be relatively straightforward." *Id*. When faced with such a general-societal-problem regulation, courts should begin by determining whether "a distinctly similar historical regulation address[ed] the problem." *Id*. If earlier generations did not regulate the problem, or if they regulated it "through materially different means," then the challenged regulation violates the Second Amendment. *Id*. Likewise, if earlier generations considered but then rejected comparable regulations as unconstitutional, "that rejection surely would provide some probative evidence of unconstitutionality." *Id*.

The second type of possible firearm regulation concerns "unprecedented societal concerns," "dramatic technological changes," or problems "unimaginable at the founding." *Id*. at 2132. These are evaluated with "reasoning by analogy."

9

*Id.* And when faced with these sorts of regulations, courts should determine whether the challenged regulation is "relevantly similar" to an earlier one, with special attention to "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33.

*Bruen* itself is illustrative. There, the Court determined that New York's general bar on "concealed carry" was designed to address a general societal problem: "handgun violence, primarily in urban areas." *Id.* at 2131 (cleaned up). And so, for New York's restriction to pass constitutional muster, the state had to "demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense." *Id.* at 2138. But the state failed to identify such a tradition. *Id.* At most, the state had shown historical restrictions on some "dangerous and unusual weapons" and "bearing arms to terrorize the people." *Id.* at 2143. Without on-point historical examples of public-carry limitations, the Court concluded, "no historical basis" contradicted "an otherwise enduring American tradition permitting public carry." *Id.* at 2145, 2154.

> **b.     There is no historical tradition prohibiting felons from possession firearms and attendant ammunition.**

The government cannot meet its burden to establish the requisite historical analogues for § 922(g)(1). As with the restriction challenged in *Bruen*, § 922(g)(1) is unconstitutional. *See Range*, 2023 WL 3833404, at *5–8 (concluding, based on a lengthy discussion of the relevant history, that no historical tradition supported prohibition).

The statute constitutes the first (and simplest) type of regulation under *Bruen*: a general-societal problem regulation. Like the urban-handgun-violence problem in *Bruen*, the "general societal problem" that § 922(g)(1) is designed to

10

address—the purported risk from ex-felons accessing guns—is one "that has persisted since the 18th century." 142 S. Ct. at 2131. Thus, like any general-societal-problem regulation, § 922(g)(1) is presumptively unconstitutional unless the government "affirmatively prove[s]" a "comparable tradition" of "distinctly similar historical regulation." *Id.* at 2127, 2131, 2132.

There is no comparable historical tradition for § 922(g)(1). Neither the federal government nor a single state barred all people convicted of felonies from possessing firearms until the 20th century.[2] *See, e.g.*, Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009); *see also Range*, 2023 WL 3833404, at *5–7. Indeed, § 922(g)(1) itself was adopted in 1968, 177 years after the Second Amendment was ratified. That timeline is too recent to have any value under *Bruen*. 142 S. Ct. at 2154 n.28 ("[L]ate-19th-century evidence" and all "20th-century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence."). Blanket ex-felon dispossession of the sort at issue here is, in other words, a modern innovation—not a historical one.

Nor is § 922(g)(1) supported by any other regulatory tradition. To the contrary, it conflicts with the tradition in every period of relevant history identified in *Bruen*: "(1) . . . early modern England; (2) the American Colonies and

---

[2] The first state law to bar the possession of some firearms by ex-felons was enacted in 1914. Catie Carberry, *Felons and Persons with a Mental Impairment*, Second Thoughts: A Blog from the Center for Firearms Law at Duke University (June 27, 2019), https://sites.law.duke.edu/secondthoughts/2019/06/27/miniseries-part-iii-felons-and-persons-with-a-mental-impairment/. And even this first law only banned possession of certain weapons.

the early Republic; (3) antebellum America [and] Reconstruction." 142 S. Ct. at 2135–36. And it also conflicts with 20th-century history, too. None of these periods contain a sufficient § 922(g)(1) analogue. And without one, the statute fails under *Bruen*.

### (1)   Depriving ex-felons of their right to bear arms does not comport with early modern English history.

Early modern England did not ban ex-felons from possessing a firearm. *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Policy 695, 717 (2009); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 260 (2020). Section 922(g)(1) therefore finds no support in this period.

To the extent that England sought to disarm individuals, those regulations generally required a more culpable mental state (generally something like specific intent) and made exceptions for self-defense, features absent from § 922(g)(1). In other words, these prior firearm possession laws are not "distinctly similar" to modern felon-in-possession laws. *See Bruen*, 142 S. Ct. at 2131. Although the government bears the burden to prove otherwise, three commonly cited historical examples—the going-armed common law offense, surety dispossession, and religious or political bars—warrant preemptive discussion.

First, going-armed laws required conduct beyond mere possession, and imposed heightened intent requirements. For example, it was a crime under the common law to "go[] armed to terrify the King's subjects." *Bruen*, 142 S. Ct. at 2141 (quoting *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686)). To be convicted of this offense, the defendant had to have "the intent to

12

cause terror in others." *Id*. at 2183 (Breyer, J., dissenting) (describing majority's view). That is a much more culpable mental state than § 922(g)(1)'s requirement that the defendant "knowingly" possessed a firearm. *See* 18 U.S.C. § 924(a)(8). Given these differences, the going-armed-to-terrify offense is much closer to assault than mere possession.

Second, surety laws (essentially a sort of bond imposed on firearm possession) required individualized adjudication for dangerousness, rather than blanket dispossession for prior felonies. England did sometimes limit prospective use of firearms by those considered dangerous through that surety mechanism. Marshall, *supra*, at 717. But a surety was individualized and non-criminal: a justice of the peace could demand that someone for "whom there is probable ground to suspect of future misbehaviour, to stipulate with and to give full assurance to the public, that such offence as is apprehended shall not happen; by finding pledges and securities for keeping the peace, or for their good behaviour." *Id*. (quoting 5 William Blackstone, *Commentaries* *386–87 (St. George Tucker ed., 1803) (1767)); *see also Rahimi*, 61 F.4th at 459–60 (discussing how sureties worked in similar terms); William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829) (citing 1 W. Hawkins, *Pleas of the Crown* 60 (1716)); 3 Sir Edward Coke, *Institutes of the Laws of England* 160 (1644)) (same). But unlike § 922(g)(1), surety laws still presumed that a person could have arms. *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting); Marshall, *supra*, at 716–23; Greenlee, *supra*, at 260. In other words, sureties targeted a different class (the violent, not the felonious) and used a different enforcement mechanism (bonds, not imprisonment). That makes them a poor § 922(g)(1) analogue.

13

Third, England's limited attempts at class-based dispossession were ordinarily religiously motivated and, in any event, still permitted those targeted to keep arms for self-defense. For example, in the age of William and Mary (both Protestants), Catholics were restricted in their ability to keep arms because they were presumed loyal to James II (a Catholic trying to retake the throne) and therefore categorically treasonous. Specifically, Catholics could only keep "Arms, Weapons, Gunpowder, [and] Ammunition" if they declared allegiance to the Crown and renounced key parts of their faith. *See Bruen*, 142 S. Ct. at 2142 n.12 (quoting 1 Wm. & Mary c. 15, § 4, in 3 Eng. Stat. at Large 399 (1688)); *see also* An Act for the more effectuall preserving the Kings Person and Government by disabling Papists from sitting in either House of Parlyament, 1 Charles II stat. 2, in 5 Stat. of the Realm at 894–96 (1678). But even then, Catholics could keep some arms for self-defense; they could "keep 'such necessary Weapons as shall be allowed . . . by Order of the Justices of the Peace . . . for the Defence of his House or Person.'" *Bruen*, 142 S. Ct. at 2142 n.12 (omissions in original) (quoting 1 Wm. & Mary c. 15, § 4, in 3 Eng. Stat. at Large 399 (1688)). Thus, even when England assumed that Catholics were engaged in mass treason, they still had "a right to own arms for personal defense." Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 123 (1994).

And even that dispossession-of-religious-minorities-in-public tradition had little carry-over to the American colonies. Class-based dispossession efforts were broadly rejected by Founding-Era Americans as the product of improper animus. *Heller*, 554 U.S. at 593; *Rahimi*, 61 F.4th at 456. Rather, efforts to guarantee firearm rights were the working template. *Heller*, 554 U.S. at 593 (describing the 1689 English Bill of Rights, which guaranteed firearm rights, at least for

14

Protestants, as the "predecessor" to the Second Amendment). Thus, "prevent[ing]"—rather than enabling—the "politically motivated disarmaments" from English history was the basis of the Second Amendment. *Rahimi*, 61 F.4th at 456.

In short, English law never tried to disarm all felons.[3] *See, e.g.*, *Quiroz*, 2022 WL 4352482, *5 (finding no evidence that the colonies barred firearm

---

[3] It is true that, in a technical sense, some ex-felons could no longer bear arms because (1) they were executed, or (2) they forfeited their firearms upon a felony conviction. Marshall, *supra*, at 714. But neither practice suggests that the Framers understood that the right to keep and bear arms excluded all ex-felons. *See also infra* at 20 (discussing early American punishment of felons). That is because neither execution nor forfeiture necessarily attended a felony conviction; nor were those punishments primarily motivated by desire to dispossess the defendant of firearms.

As to execution, England let most felons live. Between 1718 and 1769, for instance, about 15.5% of felons convicted in London's chief criminal court received the death penalty. Javier Bleichmar, *Deportation as Punishment: A Historical Analysis of the British Practice of Banishment and Its Impact on Modern Constitutional Law*, 14 Geo. Immigr. L.J. 115, 126 (1999) (citing A. Roger Ekirch, *Bound For America: The Transportation Of British Convicts To The Colonies* 1718-1775, at 21 (1987)). Execution was even less common in the early United States. *Id.* at 20. In addition, execution's main purpose was not to relieve offenders of their guns. It was instead a separate punishment without consideration of an offender's right to own weapons.

Forfeiture as punishment was ordinarily only retroactive, removing those guns the ex-felon already owned. Even in England, "it did not follow that one could not thereafter purchase and hold new personal property—including a gun." Marshall, *supra*, at 714. And more importantly, the Framers tended to "condemn forfeiture of property, a[t] least in cases of felony, as being an unnecessary and hard punishment of the felon's posterity." 2 James Kent, *Commentaries on American Law* 386 (O.W. Holmes, Jr., ed., 12th ed., Little, Brown, & Co. 1873) (1826).

The inability to hold firearms in death or as part of temporary forfeiture do not, in short indicate a historical tradition of prospectively criminalizing firearm ownership by ex-felons.

15

possession under English rule). Rather, English lawmakers tried to *limit* the use of firearms by those individuals found to be violent and rebellious. And even violent and or rebellious individuals could keep arms for self-defense. That history of generally religiously motivated dispossession was also largely rejected by Americans. Early modern English history therefore does not offer a "distinctly similar historical regulation" to justify § 922(g)(1). *Bruen*, 142 S. Ct. at 2131.

> **(2)    No Founding Era or Constitutional-period tradition supports the blanket prohibition contained in § 922(g)(1).**

> **(a)    Founding Era statutes and regulations suggest (at most) concern about national allegiance, not criminal history.**

Likewise, "there is little evidence of an early American practice" barring all people convicted of a felony from possessing a firearm. *Bruen*, 142 S. Ct. at 2142; *see Range*, 2023 WL 3833404, at *5–7. That is unsurprising; the new Nation had a more permissive approach to firearm regulation than England. *See, e.g.*, Rawle, *supra*, at 126. And as discussed above, even England lacked such bars.

Perhaps most significantly, no Founding Era statutes or interpretations of the common law barred all ex-felons from possessing firearms. *See Range*, 2023 WL 3833404, at *5–7; *see also Kanter*, 919 F.3d at 454 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 915 (Bibas, J., dissenting); *United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010); *Binderup v. Att'y Gen. of the U.S.*, 836 F.3d 336, 368 (3d Cir. 2016) (en banc) (Hardiman, J., concurring). That there are no such laws is fatal under *Bruen*.

16

There were, to be sure, a handful of other dispossession efforts—but none that justify the categorical bar imposed by § 922(g)(1). Such restrictions were ordinarily both targeted and regulatory, rather than blanket and criminal. For example, like England, the colonial Virginia government disarmed Catholics (still viewed as traitors to the Crown) who would not "swear an oath abjuring the ecclesiastical authority of the Pope." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007) (citation omitted). But even in disarming Catholics, there were exceptions for firearm possession for self-defense; a justice of the peace could authorize possession "for the defense of his house and person." *Id.* Similarly, following the Declaration of Independence, Pennsylvania ordered that those who did not pledge allegiance to the Commonwealth and renounce British authority be disarmed. *Id.* at 159. But even such dispossession was directed at national allegiance (rather than criminal past) and regulatory (rather than criminal). *Id.*

Moreover, even these targeted dispossessions were generally temporary. For example, leaders of the early Massachusetts Bay Colony once briefly disarmed supporters of a banished seditionist. Greenlee, *supra*, at 263 (citations omitted). But those individuals could get their guns returned, at least on some conditions; "[s]ome supporters who confessed their sins were welcomed back into the community and able to retain their arms." *Id.* And in 1787, the participants in Shay's Rebellion—who had attacked courthouses, a federal arsenal, and the Massachusetts militia—were barred from bearing arms for only three years. *Id.* at 268–67. In the meantime, the Commonwealth of Massachusetts acted as the bailee of the rebels' arms, tasked by law with returning the weapons to the rebels

17

after that period. Sec'y of the Commonwealth, *Acts and Resolves of Massachusetts 1786–87*, at 178 (1893).

The historical tradition at the Framing, in other words, did not routinely dispossess ex-felons of their firearms, never mind permanently. "The Founding generation had no laws limiting gun possession by . . . people convicted of crimes." Winkler, *supra*, at 1563 n.67. Indeed, if anything, the tradition was to return seized firearms to defendants after their debt to society had been paid. That tradition conflicts with a permanent, class-based, criminal law like § 922(g)(1). Depriving felons of their right to bear arms does not comport with 19th-Century history.

American 19th century history—both before and after the Civil War—also confirms that § 922(g)(1) does not reflect the "Nation's historical tradition of firearm regulation."[4] *Bruen*, 142 S. Ct. at 2135. During the 19th century, the United States regulated—but did not ban—firearm possession by those feared to be violent. *Id.* at 2148. The regulations that did exist were primarily temporary and targeted, as was true in earlier historical periods as well. *Id.* (identifying that 19th-century surety laws allowed people likely to breach the peace to still keep guns for self-defense or if they posted a bond).

As discussed above, targeted regulatory restrictions are not similar to § 922(g)(1), which imposes a permanent, broad, class-based criminal ban. There is no evidence of a precursor to such an approach. To the contrary, the relevant

---

[4] *Bruen* separately discusses pre- and post-Civil War 19th-century American history. *See* 142 S. Ct. at 2145–54. Because much of the relevant history is thematically similar during those periods, Mr. Brown combines those discussions here in the interest of brevity.

18

19th century history contains at least two instances in which attempts to disarm a class of offenders were rejected as inconsistent with the right to bear arms.

First, as with Shay's Rebellion, post-Civil-War Congresses declined to categorically disarm southern militia members who fought against the Union. *See Whether the Second Amendment Secures an Individual Right*, 28 Op. O.L.C. 126, 226 (2004). The reason: many in Congress feared that doing so "would violate the Second Amendment." *Id.*; *see Bruen*, 142 S. Ct. at 2131 ("[I]f some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality."). Congress's decision to protect the Second Amendment came at the same time it overrode a presidential veto to pass a statute that divested former southerners of voting rights. First Supplementary Reconstruction Act of 1867, ch. 30, 15 Stat. 14 (1867).

Second, what few class-based dispossession laws appeared at the state level were commonly rejected as unconstitutional. The Texas legislature had once, for instance, directed that people convicted of unlawfully using a pistol be disarmed and fined. *Jennings v. State*, 5 Tex. Ct. App. 298, 298 (Tex. 1878). But the Texas Court of Appeals—then the state's highest criminal court—promptly held that statute unconstitutional in *Jennings v. State*:

> The Legislature has the power by law to regulate the wearing of arms, with a view to prevent crime, but it has not the power to enact a law the violation of which will work a forfeiture of defendant's arms. While it has the power to regulate the wearing of arms, it has not the power by legislation to take a citizen's arms away from him. One of his most sacred rights is that of having arms for his own defence and that of the State.

19

1

2

   This right is one of the surest safeguards of liberty and
self-preservation.

3

*Id.* at 300–01. While *Jennings* interpreted Texas's state constitution, not the

4

federal Second Amendment, the Texas constitution is more restrictive of gun

5

rights than the federal constitution. *Compare* Tex. Const. art. 1, § 23 (giving the

6

legislature "power, by law, to regulate the wearing of arms, with a view to

7

prevent crime"), *with* U.S. Const. amend. II (not giving that power); *see also*

8

*Bruen*, 142 S. Ct. at 2153 (identifying that 1870s Texas had unusually strict

9

firearms regulations). That *Jennings* would hold a class-based ban

10

unconstitutional, then, reveals that the 19th-century view of the firearms right

11

foreclosed categorical dispossession of the sort imposed by § 922(g)(1).

12

   Mass disarmament for people convicted of an offense finds no support in

13

the 19th-century. Section 922(g)(1) finds no *Bruen*-sufficient tradition in that

14

period, either.

15

   For a firearm regulation to pass constitutional muster, the Second

16

Amendment requires historical grounding. There is none for § 922(g)(1). The

17

statute's permanent criminalization of possessing firearms and attendant

18

ammunition for an entire class of individuals—those with previous felony

19

convictions—is a 20th-century creation. That is not enough under *Bruen*. The

20

statute is therefore unconstitutional.

21

   The indictment seeks to use that statute to punish Mr. Brown for

22

possessing items core to the exercise of his Second Amendment right and should

23

therefore be dismissed.

24

25

26

1

## II.    Conclusion

2

Mr. Brown respectfully requests the Court dismiss the indictment against

3

him.

4

DATED: June 15, 2023.

5

RENE L. VALLADARES

6

Federal Public Defender

7

*/s/ Joanne L. Diamond*

8

JOANNE L. DIAMOND

9

Assistant Federal Public Defender
Attorney for Justin Edward Brown

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26